We'll now hear the last argument on today's calendar, that's Estevez et al. v. Berkeley College et al. All right, Mr. Bergstein, you have 10 minutes, and you've not reserved any time for rebuttal, correct? I did, three. How much? Seven and three. Three, okay. Okay, good morning. Stephen Bergstein for the plaintiff appellants. Let me start with the hostile work environment claim. There are two legal principles relevant to claims like this on summary judgment. Number one, trial court has to look at the allegations in their totality and not break down the allegations piecemeal. And number two, when you have a hostile work environment claim where the allegations are arguably vague or it might be a close case, we leave the question to the jury as to whether it is severe or pervasive. That is language from Gallagher v. Delaney from 1998, and it's still good law in this circuit, and it's one of the most important things this court has ever said about hostile work environment claims on a motion for summary judgment. We're talking about a hostile work environment on the basis of a protected ground. Yes. And that's where I am having problems. All right, well, let me start with the bad actors. Okay. And again, it's a totality. The workplace is not a hostile work environment under the statute. Correct. But here we have ‑‑ let me start with Carmichael. District court said, well, maybe it's because of sex, but it's too mild, it's too innocuous, it's not derogatory. She was making pitiful comments. She wanted to be one of the crowd. All right, you can argue that to the jury at trial, but what Carmichael was doing, and four witnesses testified to this, including three plaintiffs, was that she had an unusual preoccupation with the other women in the office and what they looked like and their bodies and their legs. And, you know, it wasn't simply that she was making these constant comments about their physical appearance. There was sort of an ominous tone to them, and each plaintiff testified to this. McEwley feared for her safety. Estevez said it didn't come from a good place. You know, there's a sexual component to what Carmichael was saying, and even if it's not your typical hostile work environment claim where there's touching or sexual demands, it still is based on gender. District court recognized that but said it's too mild. Well, I don't know if it's mild if four people are testifying that this is what's going on, and it led to a performance improvement plan against Carmichael because she became, quote, an HR topic. So that's Carmichael. Where's the evidence that that's what led to the performance improvement plan? There is testimony from a supervisor by the name of Helveka who testified that that informed the PIP in part. It's not explicit in the PIP. He was trying to address the plaintiff's complaints about Carmichael, and he made reference in the PIP to communication problems and language in the workplace. So, you know, a jury can find that there was a concern, there was an HR concern about these comments which have a gender component to them. I don't think it's a stretch to say there's a gender component to Carmichael's comments. But then we get to Lipan, and again, this is all in the same small office, so the plaintiffs are being subjected to all this. In addition to Carmichael, Lipan says repeatedly there's too much estrogen in this office. Now, that has a gender component, too, obviously. Was that while he was in the bullpen? Yes. He got moved into a separate office. And then he left the bullpen because there was too much estrogen, so he said. Because he requested a separate office. Right, but he was saying it all the time. And, you know, Estevez said she heard Lipan say this more than 30 times in one year to rationalize his refusal to work with the plaintiffs. Oveleme, a non-party witness, said Lipan said this to everybody, which he would have because it's a relatively small office. So looking at the evidence in the aggregate, you have Carmichael's ominous comments about gender and the way the women look and how beautiful they are and how they look in a dress. You have Lipan saying there's too much estrogen. You know, a jury could say under Gallagher and under the totality test that this all altered the work environment for the worse. Right. You started by saying that the judge didn't talk about the totality of the circumstances, as she should have, but page 27 of the opinion she specifically says, I considered the combined effect of the conduct as part of the totality of the circumstances. Correct, but did she? And at page 37, again, she talks about viewed together under the totality of the circumstances, no reasonable juror could find. She used that language, but did she apply that language? Did she apply the test? I don't think so. You know, looking at it in the totality, you know, if you're HR and you know about this, then you know there's a problem. And, you know, you have two bad actors going at it at the same time, coming at you with a hostile work environment from different angles. The work environment is altered for the worse. That's the standard in this circuit when you have a Title VII sex harassment is the work environment. I consider you're disagreeing with Judge Sebel's conclusions, but I think what Judge Viscoso is saying is that you also seem to be suggesting that she didn't procedurally do what a judge is required to do. I recognize that she uses the language from this Court's cases that say you're supposed to look at totality. Did she actually consider the totality and what it's like to work in a place like this? Well, how does one consider the totality without going through each complaint and then saying viewing them as a whole, that's the totality? How else would one do it? My argument is a jury looking at this in the totality could reach a different conclusion and say if I'm working there and I'm a woman, my work environment is different because of what's going on here. Again, that's a disagreement with her conclusion, not with the process. Right. What you're really arguing is that for her to have reached this conclusion, there has to have been a process problem or failure to follow this standard, and I don't think that. That's really what I'm saying. The district court did not really look at the evidence from a totality standpoint because we have too much going on here that's based on gender that's affecting the workplace for the worse. And we have a third bad actor, not as bad as the first two, but we do have a third bad actor, Joel Martinez, a senior supervisor. He makes a sexist comment to McEwley disparaging working mothers, of which McEwley was one, suggesting that when Mancini comes back to work, she's not going to be able to handle the job because she has a new baby. This court has said comments like that support a stereotype claim under Title VII. A comment like this, you throw that into the mix as well. You tell a jury this is a work environment that is hostile under Title VII. So on this basis, the jury can find that there's a hostile work environment. If the case went to trial and the jury found there was a hostile work environment, I don't know if this court would feel comfortable overturning that verdict on evidentiary grounds because we do leave it to the jury to make these determinations about what the bad actors intended when they made comments like this and whether in our evolving social mores, which is language from Gallagher, a jury today as opposed to 25 years ago could say this is a hostile work environment based on gender. So I know I have three minutes for rebuttal. I've run out of time. I can answer any questions or I can resume on rebuttal. Thank you. Let's hear from Mr. Noonan. You have ten minutes, Mr. Noonan. Thank you, Your Honors. My name is Brad Noonan for Appellate. I'm with the law firm of Ford, Harris, and LLP. This court has reaffirmed as recently as 2018 and 2020 that the hostile work environment standard is a high bar. And the reason for that, there's a subjectivity and an objectivity element. The conduct must create an objectively and subjectively severe and pervasive abusive work environment. I think we understand the language and I think there's a lot of other cases that basically say we don't want to be the personnel department for every employer in three states. But we know what we're arguing, what the argument is here. The argument is does this pass the threshold. And we use a reasonable person standard for the objectivity standard. On call instructs us when we look at the reasonable person standard that we take into account the context, the surrounding circumstances. And so we have to look at the conduct and we measure it against that. We have cited a legion of cases in our briefs, in our response to the amicus briefs, where conduct similar or more egregious has been found to not be, to rise to the level of an objective hostile work environment versus plaintiff who has, the appellant who has only cited two cases. Gallagher is in a completely egregious case. And in the other case they cited where there was evidence of this person wanting to choke the other person and so forth. But when we look at the case, this case at its core is predominantly about same-sex compliments by a subordinate co-worker employee directed to three plaintiffs, two of which are superior to her, in a predominantly all-female workplace. That's what we start with. I don't even know why we ever even talk about Martinez for the most part. Martinez's conduct, first of all, Mancini does not even allege any conduct about him. In what we look at the objectivity component, we are only looking at what the person themselves experienced. We don't look at what other people experienced. Of course, it can be what they witnessed and so forth. But McCulley does not, Mancini does not allege that Martinez did anything directed at him or that she overheard anything. There's nothing in the record about that. As for what he did towards Estevez, Estevez can't even recount a single flirtatious joke. So we can't even measure whether or not his jokes were severe or pervasive in the slightest. We need some content to know whether or not these flirtatious jokes. And flirting cannot be biased. But doesn't that suggest there should have been a trial to allow that to be developed? In her deposition, she did not, she could not testify. She was asked what were the jokes. I don't know. In fact, the most that she said was that the jokes were about our background, everyday stuff. So it actually suggests they were benign in nature. And then her main complaint is that maybe she felt that he was flirting with her or something like that. But there's no allegations by her, and she testified to this, that he ever made any sexual advances, ever asked her out on a date, ever touched her in any respect whatsoever. And so, and I don't think anybody would argue flirtation, just general flirtation by itself is unlawful, is somehow, we're outlawing that in the workplace. It has to be flirtation that gets rejected. It has to be flirtation that becomes somewhat inappropriate. And we have no evidence of what she said he did. She couldn't remember. So Martinez, and then the last thing Martinez did was make the comment to McCulley about Mancini. So it's what, Martinez has barely done anything in this case that she should almost be considering, either non-actionable or so innocuous and mild. LaPan, again, Mancini never alleges that LaPan, there's no evidence that Mancini heard LaPan say anything in the record. McCulley says LaPan said things twice. And in her deposition, it's actually critical what she says in her deposition, because I saw it last night and I was like, I want to read this. I don't recall complaining to anyone about Daniel, no. I had my own complaints about him a month or so before I was let go, just to myself. That was the first time. I started feeling uncomfortable around Daniel because him and Leslie would constantly go behind closed doors. That's the first time he started feeling. At the end of her employment, a month before she was terminated, she testifies. So subjectively, she's not even, or even objectively speaking, however you want to look at it, this is not impacting her work environment. His two comments that she alleges that he heard by LaPan, not impacting her work environment. At the end of her employment, she says it's because she sees LaPan and Leslie socializing in a way that makes her uncomfortable. So you can, and then, of course, we have the 30 times that Estevez claims that she heard LaPan say the estrogen comment. But as Judge Seibel noted, the estrogen comment is directed to the group. It's directed to the group of women. He is the only man. We're instructed to keep context in mind. This is a predominantly all-female work environment. From 2014 to 2015, it was actually all-female. LaPan starts in 2015. This work environment had, there's evidence in the record that there was communications in the workplace where there was communication about some of the plaintiffs' breast augmentation surgery, rhinoplasty surgery. There was discussions about shopping, shopping for shoes. And at the end of the day, there's a lot of drama going on in this work environment. And so whatever his intention of saying, I want to get out of this office and work someplace else, and however sophomoric his comment was in communicating that he wanted to do that, when we take all this together, the point of Judge Seibel's opinion is, objectively speaking, we cannot conclude that this is a work environment that has become severe and pervasive and become an abusive work environment. Moving on to the retaliation claim, all I just want to remark on that is that, essentially, this is one of those standard retaliation claims where the plaintiff, A, cannot establish a criminal case because there's no protected activity complained of. It's one of those instances where a plaintiff might think they're complaining about something. It might be in their head. We don't know. But at the end of the day, there is no allegations that anybody came forward to decision makers that they felt that they were being discriminated against. Now, of course, there's no magic words, but the content of what is communicated does not include anything to connect it to the person's sex in any way. Mancini's main complaints is the June 6th email to Gilliam, H.R. It's a 78-line email, and it's undisputed that she does not reference her. I'm sorry, this is Estevez or Mancini? Sorry, this is Mancini. Mancini. In the email, July 6th email to Gilliam, it's undisputed that she does not mention or complain at all about Carmichael's making comments about her physical characteristics at all. The plaintiffs' appellants tried to say that that email should be read in conjunction with the 2016 PIP that Carmichael got, which they also concede says nothing about her physical appearance comments. And so they believe that somehow Gilliam should have known that the email she got in July would have somehow magically communicated to her through some kind of mind-reading thing that that's what was intended. Even though the July 6th email only references the PIP, 70-line word email, in three lines where it says, the PIP was removed by Martinez and Orsini. They didn't ask me about it. I'm paraphrasing. But then she goes, I would have agreed to it, or I would have been open to it had they asked me. So the whole thing that she's saying is the heart of her protective complaint, if you want to call it that, is she would have been open to removing. She would have been open to removing the very thing that she thinks is imbuing her email with protective status. It's just illogical. It doesn't follow. McCulley and Esteves, they equally don't have protective complaints for the same reasons. Esteves complains to Bertone. It's all generic. It's all about Daniel LaPanza and subordination. She never complains about Carmichael. There's no evidence of that. So the only evidence of complaining about LaPan is to Bertone. And she just didn't testify that she complained about it. She was asked. I asked her specifically, over and over, what specifically did you say? I asked her repeatedly. The deposition testimony goes on for three pages, and she doesn't say estrogen comment. She says a lot of other stuff, stealing my students, not talking to me. He's just difficult to work with. But she doesn't say the heart of her own claim. The same with McCulley. McCulley claims that she spoke to Gilliam, and that turns her complaint into a protective activity. And she equally didn't say anything. She said, you know, Carmichael was difficult to work with. She texted me often. She just wanted to be my friend. I don't like working with her. And she stared at me. That doesn't turn a complaint into a protective complaint at the end of the day. We also, the judge also found that, the liberal court also found that we established pretexts. If you have any questions on that, I'd be happy to answer. I see my time's running. Thank you very much, Mr. Noonan. We'll hear from Mr. Bergstein for three minutes of rebuttal. Okay, let me start with the hostile work environment. The issue with Martinez, he made flirtatious jokes. Plaintiffs said they were rude, weird, flirty. We just heard that they're not detailed. You don't need that kind of detail in a hostile work environment claim. This court has said, in many cases, including Torres, 116F3 at 631, exact dates and circumstances. We're not talking about exact dates. We're talking about exact instances. I mean, this is just sort of very general statements of discomfort or unease. Right, but she does mention that they were flirty and rude and weird. The details matter, don't they? Maybe not the specific dates and times, but the details of the conduct. Otherwise, we have nothing to go on, right? Those aren't even factual allegations. They're sort of conclusory statements. Well, this court has said that the lack of detail may make it harder to win before a jury, but it's still enough to – we're throwing it into the mix of the overall work environment. Martinez is not the worst actor here, but Estevez did say he was doing offensive things as well. Let me talk about Le Pan. The question of his intent and what he meant when he said there's too much estrogen in the room, his intent is for the jury. That's a general rule for even in disparate treatment claims, but this court has said the harasser's intent for making comments like that is also for the jury. This court said that in Razney v. Marriott a couple of years ago. The district court said, by the way, that the plaintiffs in dealing with Le Pan's comments, that these were, you know, annoying and ignorant, but the way to deal with it is an eye roll or a snappy comeback. Not really. That's just going to make things worse. I don't know what kind of comeback the plaintiffs are supposed to do when Le Pan makes comments like this, but that's not the right way to deal with a hostile work environment. Let me talk about retaliation and protected activity. There's two incidents, there's two events in the record that we claim support protected activity in terms of notice to management that this workplace is a hostile work environment. April 2017, Estevez tells her supervisor, Bertone, about Le Pan hostility. That's a word she uses. Bad, inappropriate work environment in the office. That language should trigger to any reasonably trained supervisor or HR that we have a potential hostile work environment going on here because that's the language. Is that a sufficient protected act to say that this is an uncomfortable place? Well, no, that's not exactly what she said. We have an inappropriate work environment in the office and there's hostility, and that's enough. That's not on the basis of sex. That's the language we normally associate with a hostile work environment, and this is a workplace. This is a workplace where there's some weird people. That may be, but weird. There are a lot of women. Weird includes, if I'm HR, I'm like, wait a minute. Men, guess what, there are women and men, and they're all behaving in kind of a strange way. That's what makes this case unique is you have the hostile environment coming at you from different angles, but the language, an HR person say, wait a minute, what do you mean there's hostility? What do you mean there's an inappropriate work environment? This sounds like a potential Title VII problem. We have to do something, and they didn't. Just because of the word inappropriate? Inappropriate triggers sex, and therefore that's enough for a complaint? It's not just that she said it's inappropriate. And still, how does that become a retaliation claim? It puts them on notice that we're complaining about a hostile work environment, and then they're terminated shortly after. Look, there are lots of hostile work environments, but they have to be hostile with respect to a particular characteristic. I mean, the mere fact that it's hostile is not enough to get you anyplace, right? But if you say there's hostility here, an inappropriate work environment, it sounds like a Title VII. Well, it sounds like it, but it could also be consistent with a lot of them. But she mentioned his insubordination, and the insubordination was understood to mean that he's not willing to work with the women, and he wants to work on his own, contrary to Berkeley policy. So HR should say, wait a minute, what are you telling us? But how does that become hostility because of being in a protected category? If the only man in the office can't work with the women and wants to work on his own, and somebody says we have a hostile, bad, inappropriate work environment, that sounds like a potential Title VII problem. But sounding like a potential Title VII problem, you're saying is enough to constitute a protected act for purposes of a retaliation claim? Good faith. Do you have any cases that come close to something that sounds like it might be potentially a Title VII problem being enough for a complaint? You don't have to say this is going on because of gender. But if you use the right language that puts HR on notice that we have a problem here, a potential Title VII problem, that's a good faith complaint. It doesn't mean there's a legitimate underlying complaint that's actionable, but it's enough to constitute protected activity. What about the legitimate non-discriminatory reason that's put forward? That's pretext. That's pretext. They were the worst producers. They were the worst producers. They didn't come up with admissions at the level of other people. Well, we have responses to that. It appears that management was deviating from procedure in how they assessed the employees. Defendant's policy was to measure work performance in annual performance appraisals. Here they rely on quarterly reports. That's not how you normally do it. This court has said when you deviate from- Do you have to wait a whole year for it to get really bad? How bad was it? That's another question. Well, the numbers speak for themselves. Enrollment numbers went down, but we have evidence that they went down for reasons that were out of the plaintiff's control, and defendants should have recognized that because they said- But there were comparable reports from others that were doing better. But they had only recently, prior to the protected activity, gotten very good performance reviews. And suddenly, at the same time that CUNY is offering free college tuition to high school kids in the city, affecting Berkeley's admission rates, enrollment is going down across the board. That doesn't matter. If a company in good faith believes that these people are spending not enough time at work and working on these particular issues and working hard to get the numbers up, and some other people are, why isn't that a basis for letting them go? Well, that's their argument. But our argument is that's one argument to make before a jury. The other argument is that's not a good faith belief because we know why enrollment is down across the board. But if enrollments were down across the board, everyone's numbers would be lower. Correct. When they're not. But you're holding it against these three when you know- These numbers are lower, statistically. But overall, the school's having a bad year, and they had recently gotten excellent performance reviews. They were there for years. They want to get better people in, you know, who can get the numbers up. I don't know what the problem is. That's why these issues of pretext are frequently for the jury when we talk about good faith and the employer's intent. Let me talk about, just backtracking a bit, on the July 6th email where Mancini writes this lengthy email to Gilliam. She doesn't explicitly say Carmichael is continuing to pollute the workplace. What she says is the issues that came up in the PIP last November are still with us. And Gilliam knows that the issues that led to the PIP had to do with Carmichael's comments about the women's physical appearance and their bodies. Gilliam knew this because Helvetica prepared the PIP with Gilliam's assistance. So what Mancini is telling Gilliam is the work environment that Carmichael has created hasn't gone away. It's still a problem. And if it's still a problem, then the argument is, on this court's case, is that their remedial efforts were not good enough and that you continue to have an actionable hostile work environment claim. If there's no further questions, I rest on the papers. Thank you. All right. Thank you both. We will reserve decision. That concludes the oral argument calendar. We have two other cases on submission. We'll reserve on those as well. Ms. Beard, you may adjourn the proceedings for today.